SUN COAST RESOURCES, INC.; Intercoastal Petrochemicals, Inc.; Teva Pharmaceuticals USA, Inc.; Hydrocarbon Processing Partners, Ltd.; and Hydrocarbon Processing, Inc., Appellants,

v.

John C. COOPER, Appellee.

No. 01–97–00780–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

April 23, 1998.

Bradley A. Jackson, John Victor Mastriani, Harry Herzog, Houston, James W. Watson, Fort Worth, Michael M. Gibson, Houston, for Appellants.

T. Ernest Freeman, Philip S. Gordon, Houston, for Appellee.

Before SCHNEIDER, C.J., and ANDELL and TAFT, JJ.

## OPINION ON MOTION FOR REHEARING

SCHNEIDER, Chief Justice.

We deny appellants' motion for rehearing. However, we withdraw our opinion dated February 26, 1998, and substitute this one in its place.

This is an accelerated appeal from an interlocutory order certifying a class action.[1] *See* TEX.R. CIV. P. 42. We affirm.

### Background Facts

Appellee, John C. Cooper, alleged he had purchased $196 of gasoline in March 1996 at the D & E Quick Stop in Huntsville, Texas. Two of his pickup trucks were damaged by this fuel and required repairs. Cooper sued appellants[2] for property damage and lost wages. Cooper later moved to certify a class under rule 42(b)(4). The trial court certified a class consisting of "potential claimants, namely those entities that have purchased for their consumption in automobiles certain

---

1. A party may appeal from an interlocutory order of a district court that certifies or refuses to certify a class in a suit brought under TEX.R. CIV. P. 42. TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(3) (Vernon Supp.1998).

2. We refer to the individual appellants as indicated in parenthesis: Sun Coast Resources, Inc. (Sun Coast), Teva Pharmaceuticals USA, Inc. (Teva), Hydrocarbon Processing Partners Limited (HPPL), Hydrocarbon Processing, Inc. (HPI), and Intercoastal Petrochemicals, Inc. (IPI).

Defective Gasoline[3] allegedly manufactured or distributed by one or more Defendants...."

## Standard of Review and Burden of Proof

██ There is no automatic right to maintain a lawsuit as a class action. *Weatherly v. Deloitte & Touche*, 905 S.W.2d 642, 647 (Tex.App.—Houston [14th Dist.] 1995, writ dism'd w.o.j.). Instead, a trial court *may* certify a class if the class proponent satisfies the requirements of rule 42(a) and (b). *Life Ins. Co. of the Southwest v. Brister*, 722 S.W.2d 764, 770 (Tex.App.—Fort Worth 1986, no writ). To be entitled to maintain a lawsuit as a class action, the proponent must meet all four requirements of rule 42(a) and at least one of rule 42(b)'s requirements.[4] Tex.R. Civ. P. 42(a), (b); *Reserve Life Ins. Co. v. Kirkland*, 917 S.W.2d 836, 839 (Tex. App.—Houston [14th Dist.] 1996, no writ). The proponent has to do more than merely allege rule 42's requirements are fulfilled, and it has to show at least some facts to support certification. However, it is not required to prove a prima facie case or make an extensive evidentiary showing. *Weatherly*, 905 S.W.2d at 647.

██ We review for abuse of discretion. *General Motors Corp. v. Bloyed*, 916 S.W.2d 949, 955 (Tex.1996). There is an abuse of discretion if the record clearly shows that (1) the trial court misapplied the law to the established facts, (2) the material in the record does not reasonably support the findings, or (3) the trial court acted arbitrarily or unreasonably. *Weatherly*, 905 S.W.2d at 648. We must determine only whether the trial court's action was so arbitrary as to exceed the bounds of reasonable discretion.

*Dresser Indus., Inc. v. Snell*, 847 S.W.2d 367, 371 (Tex.App.—El Paso 1993, no writ). We view the evidence in the light most favorable to, and indulge every presumption in favor of, the trial court's action. *Kirkland*, 917 S.W.2d at 839.

██ The trial court may alter, amend, or withdraw class certification at any time before final judgment. Tex.R. Civ. P. 42(c)(1). Therefore, when a trial court considers class certification at an early stage of litigation, before supporting facts are fully developed, it should favor certification. *Morgan v. Deere Credit, Inc.*, 889 S.W.2d 360, 365 (Tex.App.—Houston [14th Dist.] 1994, no writ).

██ Appellants did not request fact findings, and the certification order contained only conclusions of law. In the absence of such findings, we must presume the trial court found every fact necessary to sustain its order, provided the fact is one raised by the pleadings, supported by the evidence, and sustainable on any reasonable theory consistent with applicable law. *Employers Cas. Co. v. Texas Ass'n of Sch. Bd. Workers' Compensation Self-Ins. Fund*, 886 S.W.2d 470, 473 (Tex.App.—Austin 1994, writ dism'd w.o.j.).[5] For appellants to prevail, the undisputed evidence must negate one or more of the class action's essential elements. *Texas Dep't of Mental Health & Mental Retardation v. Petty*, 778 S.W.2d 156, 161 (Tex. App.—Austin 1989, writ dism'd w.o.j.).

## Discussion

In seven points of error, appellants attack each requirement for class certification under rule 42(a) and (b).

---

**3.** Appellants do not complain of the term "Defective Gasoline" in the class definition. We do not address the matter. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58–59 (Tex.1993).

**4.** Rule 42(a)'s requirements are as follows: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Tex.R. Civ. P. 42(a). Under the section of rule 42(b) at issue here, the court must also find that the common questions of law or fact predominate over any questions affecting individual members, and that a class action is superior to other available methods for the controversy's fair and efficient adjudication. Tex.R. Civ. P. 42(b)(4).

**5.** *Accord Angeles/Quinoco Sec. Corp. v. Collison*, 841 S.W.2d 511, 513–14 (Tex.App.—Houston [14th Dist.] 1992, no writ); *Texas Dep't of Mental Health & Mental Retardation v. Petty*, 778 S.W.2d 156, 160–61 (Tex.App.—Austin 1989, writ dism'd w.o.j.); *see Franklin v. Donoho*, 774 S.W.2d 308, 311 (Tex.App.—Austin 1989, no writ).

## A. Numerosity and Class Definition

The trial court found that "the Plaintiff Class appears so numerous that joinder of all its members is impracticable." The class definition manifestly included those who had settled or been paid without settling. In point of error seven, appellants claim the trial court erred in defining the class broadly enough to include those who had settled or been paid. Appellants' argument is really two-fold: (1) the class definition improperly included those who had settled or been paid and (2) if these were not included in the definition, the class would not be so numerous as to make joinder impracticable. In point of error one, appellants also argue the class is not so numerous as to make joinder impracticable. *See* TEX.R. CIV. P. 42(a)(1). We treat points of error one and seven together.

 Determining whether numerosity is met is not based on numbers alone. *Phillips v. Joint Legislative Comm. on Performance & Expenditure Review*, 637 F.2d 1014, 1022 (5th Cir.1981). Although the trial court must find that joinder is impracticable, there is no mechanical rule for determining when class size reaches that threshold. *Employers Cas.*, 886 S.W.2d at 474. The test is whether joinder of all members is impracticable in view of the size of the class and such factors as judicial economy, the nature of the action, geographical locations of class members, and the likelihood that class members would be unable to prosecute individual lawsuits. *Weatherly*, 905 S.W.2d at 653.

### 1. Facts

The following facts are viewed in the light most favorable to certification. No one disputes the gasoline was tainted by a tolylulene additive. Teva or IPI sold the tolylulene to HPPL and HPI, which manufactured the tainted gasoline. HPPL and HPI sold the tainted gasoline to Sun Coast, a fuel distribution company, which in turn made 20 sales of the tainted gasoline to retailers and wholesalers in various cities. One of the customers to whom Sun Coast distributed the gasoline was the D & E Quick Stop at which Cooper purchased his gasoline. The tainted gasoline was distributed by Sun Coast from the end of February 1996 until mid-March 1996, within a 100–mile radius of Huntsville. The damage caused by the tainted gasoline was widespread within the greater Houston area.

When Sun Coast learned of the problem, it reclaimed and exported what gasoline it could. Of the approximately 100,018 gallons of tainted gasoline Sun Coast distributed, it reclaimed 60,716, which left 39,302 gallons that were purchased by end-users from Sun Coast's customers.

Appellants informed the Texas Attorney General, all customers to which Sun Coast had sold the tainted gasoline, and anyone contacting Sun Coast directly that damages related to the gasoline could be reported to their claims adjuster, Bob Anderson, with Lindsey Morden Claim Service (LMCS). Anderson's name and phone number were posted in the store in which Cooper had bought gasoline. A front-page Huntsville newspaper article advised those with problems to call a free hotline number at the Attorney General's office.[6] Another Huntsville newspaper article later advised those with tainted gasoline damage to file claims with Anderson, whose name and number were given.

About 200 Houston-area motorists contacted the Attorney General's hotline by the end of March 1996. LMCS received about 650 claims. Some of these were aggregate reimbursements to Sun Coast's consumers, which had paid their customers directly and then sought reimbursement from LMCS.[7] Therefore, these 650 claims represented more than just 650 individuals or vehicles. Of these claims, LMCS paid all but about 12. LMCS got releases from all but these 12 and the

---

**6.** No appellant paid for advertising on radio or television. However, the record shows there was some television coverage, and at least one other newspaper article, within a week's time about the tainted gasoline. No contact names or numbers were listed in this newspaper article; the record does not show whether LMCS or the

Attorney General's number was broadcast on television.

**7.** One aggregate claim was for $17,000. LMCS allowed at least two retailers to submit aggregate claims.

aggregate claimants' customers. Cooper could name only between nine and 11 persons who allegedly had suffered damages from the tainted gasoline but had not been reimbursed or settled. The only lawsuit against appellants was Cooper's.

LMCS settled claims within about a 100-mile radius of Huntsville. The average claim for tainted gasoline fell in a range of $300 to $800. Viewed in the light most favorable to certification, the parties' evidence showed tolylulene could damage catalytic converters. However, Anderson admitted LMCS did not pay catalytic converter claims. By the time of the certification hearing, it had been over a year since anyone had filed a claim with LMCS.

HPPL and HPI sold tainted gasoline to only one distributer other than Sun Coast.[8] HPPL and HPI never received any complaints concerning the tainted gasoline sold this other distributer. No complaints about the tainted gasoline were received from this other distributor's clients. Conoco, not a defendant in this lawsuit, also distributed tainted gasoline during the same time to at least one other location in Huntsville and to about 45 locations in Houston. Whether the tainted gasoline caused engine damage depended on its concentration. A concentration of about 10 parts per million of the tolylulene additive would cause damage.

## 2. Discussion

■ Even if appellants are correct that those settling and signing releases cannot be counted for numerosity purposes, there are potentially many individuals who purchased the tainted gasoline, were paid by their retailers, *and never signed releases or dealt directly with LMCS. Compare Newton v. S. Wood Piedmont Co.,* 163 F.R.D. 625, 635 (S.D.Ga.1995), *aff'd without op.,* 95 F.3d 59 (11th Cir.1996); *Klakis v. Nationwide Lei-*

*sure Corp.,* 73 A.D.2d 521, 422 N.Y.S.2d 407, 409 (1979). There is no settlement contract or release to bar these individuals. Determining whether another affirmative defense, such as accord and satisfaction, could apply to these individuals would require delving into the merits of the class members' claims, as this determination involves more than determining merely who signed a release. Additionally, there is evidence that at least some individuals simply traded in their vehicles without seeking reimbursement. The trial court would not have abused its discretion in inferring these people were not reimbursed for their cars' damages, because they had no repair costs.[9]

It is also clear LMCS did not pay for catalytic converter damage. Under the applicable standard of review, we must infer that appellants' gasoline could damage catalytic converters. It is unclear whether the retailers who paid their customers directly and submitted collective claims to LMCS paid for catalytic converter damage. The trial court could rationally have concluded that a significant number of individuals— those who had not signed releases because a retailer had reimbursed them—had claims for catalytic converter damage that might not ever have been paid.

The trial court may have determined that appellants' advertising might not have reached all those with claims. It is undisputed appellants did not pay for advertising, relying instead on one Houston and two Huntsville newspaper stories over a few days; fortuitous television coverage, the details of which were not disclosed; and their giving LMCS's information to the Attorney General and their retailers. The tainted gasoline was distributed to cities outside Houston and Huntsville, but the news articles ran only in these two cities' papers. Appellants did not make further attempts at advertising

---

8. This sale was only about 7,000 or 8,000 gallons. Sun Coast distributed about 85 percent of the tainted gasoline. About 85 percent of the tainted gasoline was distributed in the Huntsville area.

9. Based on average claim size and the aggregate amounts reimbursed the retailers, those who were paid but had not signed a release could

number at least 60. This number is in addition to the few whom Cooper could name and those who simply traded in their vehicles. This Court has held a similarly sized class, apparently living within the same general area, sufficed to show numerosity. *See Hutchins v. Grace Tabernacle United Pentecostal Church,* 804 S.W.2d 598, 601 (Tex.App.—Houston [1st Dist.] 1991, no writ).

their claims procedure since the claims had ceased a year before. Under these facts, we can imply the trial court found notice of the claims procedure did not reach all potential class members, because appellants did not ask for fact findings. *See Employers Cas.,* 886 S.W.2d at 473. We cannot say such a finding would be an abuse of discretion.

Neither can we simply presume that those who bought tainted gasoline from the other supplier besides Sun Coast did not experience problems, as appellants wish. Rather, a reasonable inference supporting the trial court's ruling would be that these purchasers did not know of appellants' claims procedure. We cannot say that such a finding would be an abuse of discretion.

Because the average repair bill was small, the trial court could have concluded class members would be unable to prosecute individual lawsuits.[10] This fact also weighs in favor of certification. *See Weatherly,* 905 S.W.2d at 653.

The tainted gasoline was shipped to cities within a 100–mile radius of Huntsville. This is a very close geographic area. *See, e.g., id.* (holding geographic location of class members is a factor to consider in determining impracticability of joinder). While this factor weighed against certification, the other factors discussed above weighed in its favor. We cannot say the trial court erred in finding numerosity and impracticability of joinder under these circumstances.

Appellants also argue the fact that no new claims have been filed in a year weighed against class certification. A similar situation was considered in *Weatherly. See id.,* 905 S.W.2d at 654. In *Weatherly,* the party appealing a class certification order had argued that, because only a very small number of plaintiffs had filed suit, the court should infer that class members were uninterested in pursuing their claims. *Id.* The *Weatherly* court held no presumption arose that class members were uninterested simply because they had not filed suit or intervened in the

proposed class action. *Id.* While here, the record demonstrates there was an active claims procedure before the silence to which appellants point, we do not find this factor distinguishing. As discussed above, the trial court could rationally have concluded that notice of appellants' claims procedure did not reach everyone having a claim. The silence of any who had never learned of the claims procedure should not, therefore, be equated with lack of interest. *See id.*

We find *Makuc v. American Honda Motor Co.,* cited by appellants, distinguishable, because there the plaintiff's estimates of the class size were purely speculative. *See id.,* 835 F.2d 389, 394 (1st Cir.1987). Here, more than mere speculation supported the trial court's numerosity finding. For this reason, appellants' reliance on *Patterson v. General Motors Corp.* and *Sanna v. Delta Airlines* is also misplaced. *See Patterson,* 631 F.2d 476, 480 (7th Cir.1980) ("purely speculative" class); *Sanna,* 132 F.R.D. 47, 50 (N.D.Ohio 1990).

Accordingly, we overrule points of error one and seven.

## B. Commonality

In point of error two, appellants argue the trial court erred in certifying the class because Cooper did not demonstrate common issues of law or fact. Rule 42 requires that questions of law or fact common to all class members exist. TEX.R. CIV. P. 42(a)(2).

The threshold of "commonality" is not high. *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986). A single issue common to all class members may suffice. *Health & Tennis Corp. v. Jackson,* 928 S.W.2d 583, 590 (Tex.App.—San Antonio 1996, writ denied). The common issue may be one of law or fact. *Id.* The questions must be such that, when answered as to one class member, they are answered as to all class members. *Id.* The requirement does not mean that all or even most questions are

---

10. Appellants argue there is no evidence that individuals with small claims will find it difficult to locate counsel or prosecute claims, because no witness testified he had such difficulties. However, there was evidence the average claim size was very small. A reasonable inference is that it will be difficult to find counsel willing to sue for this small amount. We must indulge this inference. *See Kirkland,* 917 S.W.2d at 839.

identical. Rather, the issue of fact or law must inhere in all class members' complaints. *Dresser*, 847 S.W.2d at 372. Therefore, the trial court must first identify the substantive issues controlling the litigation's outcome. *Brister*, 722 S.W.2d at 772. The inquiry's purpose is to determine whether the character and nature of the case satisfies the requirements of the class action procedural rules, not to weigh the substantive merits of each class member's claim. *Id.*

The trial court found that "there are questions of law and fact common to the Plaintiff Class, namely those questions set forth in Cooper's First Amended Petition." This petition alleged strict product liability, negligence, negligence per se, false advertising, and warranty breach.[11]

█ Appellants argue that the defenses of release and accord and satisfaction applicable to class members other than Cooper prevent a finding of commonality. However, we agree with our sister courts of appeals that the existence of differing defenses does not destroy commonality. *See Microsoft Corp. v. Manning*, 914 S.W.2d 602, 613 (Tex. App.—Texarkana 1995, writ dism'd); *Angeles/Quinoco Sec. Corp. v. Collison*, 841 S.W.2d 511, 516 (Tex.App.—Houston [14th Dist.] 1992, no writ); *cf. Dresser*, 847 S.W.2d at 373 (typicality); *Adams v. Reagan*, 791 S.W.2d 284, 290–91 (Tex.App.—Fort Worth 1990, no writ) (typicality).

Based on Cooper's allegations, we can conceive of at least the following, common questions of law: (1) whether appellants had a duty of reasonable care to produce, supply, or distribute untainted gasoline, (2) whether express or implied warranties existed respecting the production, supply, or distribution of this gasoline, (3) whether appellants breached these warranties, (4) whether appellants negligently, recklessly, or willfully marketed this gasoline as having qualities it did not have, and (5) whether appellants violated any statutes or regulations, or whether they can be held strictly liable on other grounds.

█ We can also conceive of at least the following, common fact questions: (1) whether the gasoline produced, supplied, or distributed was tainted, (2) which appellants produced, supplied, and distributed the tainted gasoline, and to or for whom, (3) what types of damages appellants' tainted gasoline could cause, (4) whether appellants' tainted gasoline could cause catalytic converter damage, (5) which appellants marketed the gasoline, and (6) the content of any marketing.[12]

When these issues are answered as to Cooper, they will be answered as to all class members. *See Jackson*, 928 S.W.2d at 590. Even one common question of law or fact would have sufficed. *Id.* Accordingly, we overrule point of error two on this ground.

### C. Predominance

The trial court found that "the questions of law and fact common to the Plaintiff Class predominate over any questions affecting only individual members." *See* Tex.R. Civ. P. 42(b)(4). In the remainder of point of error two, appellants argue this conclusion was error.

█ The test for "predominance" is not whether the common issues outnumber the individual issues; rather, it is whether the common issues will be the object of most of the efforts of the court and litigants. *Jackson*, 928 S.W.2d at 590. Put another way, if common issues predominate, then a judgment in favor of the class members

---

11. Cooper's factual allegations may be summarized as follows: he purchased tainted gasoline; appellants either manufactured or distributed the tainted gasoline; the gasoline damaged his vehicles, which had to be repaired; he lost revenues, because he could not drive to work; and appellants' tainted gasoline proximately caused these damages. Cooper sought actual, consequential, and punitive damages, as well as attorneys' fees and costs.

12. Cooper did not identify all these common questions in his certification motion. However, to determine common questions, we look to the substantive law issues controlling the litigation's outcome. *See Brister*, 722 S.W.2d at 772. We determine what the substantive issues are by looking to the elements of the causes of action alleged in Cooper's petition, which the trial court's order referenced. Additionally, it was appellants' burden to request specific findings of fact, in order to know the factual bases of the trial court's decision.

should decisively settle the entire controversy, and all that should remain is for other class members to file proofs of their claims. *Manning,* 914 S.W.2d at 611.

First, appellants argue proximate or producing causation would have to be litigated individually. In support, appellants note that whether damage resulted depended on the tainted gasoline's concentration. Therefore, they argue that class members would individually have to prove the concentration of the tainted gasoline they bought. Appellants also note that companies other than appellants sold tainted gasoline. Accordingly, appellants argue that each class member would have to prove individually from whom he purchased gasoline. Second, appellants argue that damages would have to litigated individually, because one class member's damages would not necessarily be the same as another's.

Although we agree that several issues will have to be litigated individually, we hold the trial court did not abuse its discretion in finding common issues would predominate. First, contrary to appellants' argument, the record demonstrates to which retailers and wholesalers and on what dates Sun Coast distributed appellants' tainted gasoline. Therefore, if a class member bought gasoline on these dates from one of these retailers or one of these wholesalers' customers, he purchased appellants' tainted gasoline. Accordingly, answering the common question of to whom and when the tainted gasoline was sold will answer it for all class members. If the trial court later finds the inquiry is not so straightforward, it can amend or revoke the certification. *See* TEX.R. CIV. P. 42(c)(1).

Second, the evidence viewed in a light most favorable to Cooper demonstrates the tainted gasoline damaged engines in similar ways. That is, the tainted gasoline produced tell-tale damage and symptoms (except for the dispute over catalytic converter damage). Accordingly, if a class member could show he bought gasoline from one of Sun Coast's customers (or a retailer to which the customer sold it), within the dates at issue, and immediately experienced these tell-tale damages, he might be able to show causation. Showing causation would not, therefore, necessarily be the individualized quagmire appellants predict.[13] At least, we cannot say the trial court abused its discretion in so finding. If, after further discovery, it appears a liability determination is highly complex and individualized, the trial court may always modify or revoke the certification. *See* TEX.R. CIV. P. 42(c)(1). Additionally, the fact that damages must be computed separately for each class member will not prevent class certification. *Jackson,* 928 S.W.2d at 590; *Angeles/Quinoco,* 841 S.W.2d at 516.

Third, appellants point to decisions denying class certification in mass product liability and tort suits to show these types of actions are often ill-suited for certification.[14] *See also* FED.R.CIV.P. 23(b)(3) advisory committee's note to 1966 revision (noting class action often inappropriate for mass accidents). Regardless, this case is simply not of

---

**13.** We find *RSR,* on which appellants rely, distinguishable. *See RSR Corp. v. Hayes,* 673 S.W.2d 928 (Tex.App.—Dallas 1984, writ dism'd w.o.j.). In *RSR,* the plaintiffs alleged RSR's lead smelter emitted lead pollution damaging property, causing illness, diminishing the land's recreational use, and decreasing property value. *Id.* at 929. There was expert testimony that lead deposits varied within the geographic class boundaries; the property's use varied; lead could have come from automobiles in some areas; lead exposure and health risk depended on how long an individual had resided, and what he did, on the land; and some individuals had no injuries. *Id.* at 930. The trial court certified the class. *Id.* In reversing, the *RSR* court held that no common questions, including liability or proximate cause, existed. *Id.* at 932–33. Here, in contrast, the class members' injuries are not so disparate, and the

facts, as discussed above, have more in common than in *RSR.* For similar reasons, *In re "Agent Orange" Prod. Liab. Litig.,* also cited by appellants, is distinguishable. *See id.,* 818 F.2d 145, 164–65 (2nd Cir.1987).

**14.** *See In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1081 (6th Cir.1996) (penile prosthesis; multistate); *In re Gen. Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 800 (3rd Cir.1995) (reversing because trial court did not make separate rule 23 findings for "settlement class"); *In re Rhone–Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir.1995) (blood solids; multistate); *In re N. Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.,* 693 F.2d 847, 850 (9th Cir. 1982) (IUD; multi-state).

the same nature. The facts in the mass tort cases that appellants cite were far more complex or involved several jurisdictions' laws, so that individual issues clearly dominated common ones.

We find support for our conclusion in *Dresser. See id.*, 847 S.W.2d at 375. In *Dresser*, the plaintiffs were owners of royalty interests in 523 wells. *Id.* at 371. The plaintiffs accused the defendants, well servicing companies hired to make the wells more productive, of engaging in a scheme to cheat on the materials used to service the wells, reducing the amount of recoverable oil. *Id.* Each plaintiff claimed the scheme damaged its royalty interest. *Id.* The trial court certified a class, and the *Dresser* court affirmed. *Id.* at 376. The *Dresser* court held it was within the trial court's discretion to find common issues predominated over the individual issues of false representations, reliance, damages, defenses, and the facts surrounding the defendants' activities over six years at 523 wells. *Id.* at 375. If no abuse of discretion occurred in *Dresser*, none occurred here.

▇▇▇ Finally, even when it is not conclusively established that common issues predominate, the most efficient approach is to certify the class and if necessary, after the case develops, to dissolve the class or certify subclasses. *Jackson*, 928 S.W.2d at 590; *Kirkland*, 917 S.W.2d at 843. Not having obtained fact findings, appellants have to show the undisputed evidence negates commonality or predominance. *See Petty*, 778 S.W.2d at 161. Because the trial court's commonality and predominance conclusions are supported by the above evidence, appellants have not met this burden. *See Angeles/Quinoco*, 841 S.W.2d at 516. Therefore, we hold the trial court did not abuse its discretion, at this early stage of litigation, in finding common issues would predominate.

We overrule the remainder of point of error two.

### D. Superiority

▇▇▇ In point of error three, appellants claim the trial court erred in certifying the class because a class action is not superior to other adjudication methods. *See* Tex.R. Civ. P. 42(b)(4). A class action is the superior method of adjudication when the benefits of classwide resolution of common issues outweigh difficulties that may arise in class management. *Weatherly*, 905 S.W.2d at 654. The trial court should consider the alternative procedures for disposing of the dispute and compare these to the judicial resources and potential prejudice to absent class members involved in pursuing the class action. *Brister*, 722 S.W.2d at 772. The alternatives to class action usually involve individual adjudication and the practicality and availability of joinder. *Id.* The rule sets out four factors for determining superiority and predominance: (1) the class members' interest in individually controlling the prosecution or defense of separate actions, (2) the extent and nature of any litigation concerning the controversy already commenced by or against class members, (3) the desirability of concentrating the litigation in the particular forum, and (4) difficulties likely to be encountered in the class action's management. Tex.R. Civ. P. 42(b)(4)(A)-(B). The court may also consider whether (1) class members have an interest in resolving the common issues by class action, (2) class members will benefit from discovery already commenced, and (3) the court has invested time and effort in familiarizing itself with the issues in dispute. *Weatherly* 905 S.W.2d at 654–55.

Appellants argue their voluntary claims procedure is superior to a class action.[15] They rely on *Berley v. Dreyfus & Co.*, in which the court found the defendant's settlement procedure superior to a class action. *See id.*, 43 F.R.D. 397, 398–99 (S.D.N.Y. 1967). The *Berley* court noted that enjoining the defendant from pursuing settlement would not serve any useful purpose and a

---

**15.** Rule 42(b)(4) requires that the class action be superior to "other available methods for the fair and efficient adjudication of the controversy." *See* Tex.R. Civ. P. 42(b)(4). Cooper argues "methods for ... adjudication" does not include voluntary settlement procedures. Appellants have found authority to the contrary. *See Berley v. Dreyfus & Co.*, 43 F.R.D. 397, 398 (S.D.N.Y. 1967). Because we have found no Texas case on point, we assume for the sake of argument that appellants' claims procedure would fit within the Texas rule's definition. *See id.*

class action would be more complicated. *Id.* at 399. *Berley* was a district court opinion, not that of an appellate court reviewing for abuse of discretion. Additionally, in *Berley,* the settlement procedure was only two months old and on-going at the time of the certification order. *Id.* at 398.

 Here, in contrast, more than a year had passed since LMCS had received a claim. We have already held the trial court could reasonably infer that some individuals had not been reimbursed or had not settled *as of the hearing's date.* Yet none of these had taken advantage of appellants' claims procedure in a year. The trial court could rationally have concluded that these individuals might not get reimbursed without a class action, especially because appellants had not advertised since the incident. Additionally, we have held the trial court could rationally find that those who had been reimbursed without signing releases might still have claims for catalytic converter damage. Their filing claims with appellants even now would be fruitless, because of appellants' admitted refusal to pay these claims. Given these facts and inferences, we cannot say the trial court erred in finding a class action superior to a voluntary claims process long dormant.

Appellants also argue the fact that no one other than Cooper has filed suit weighs against class certification. *See* TEX.R. CIV. P. 42(b)(4)(B), (C). They cite *Castano v. American Tobacco Company* in support. *See id.,* 84 F.3d 734, 747 (5th Cir.1996). *Castano* is distinguishable. In *Castano,* the plaintiffs sued several tobacco companies on the then-novel and wholly untested theory that the companies fraudulently withheld information of nicotine's addictive qualities and manipulated the nicotine levels in cigarettes. *Id.* at 737. Plaintiffs sought compensation solely for nicotine addiction, a theory that the *Castano* court identified as "novel." *Id.* In re-

versing a class certification, the *Castano* court held that the trial court could not have conducted a superiority analysis without a prior track record of trials *based on these novel theories of law and damages. Id.* at 747–48. A class action also was not superior because of manageability problems, such as complex choice-of-law issues and *Erie* [16] guesses. *Id.* at 747. Without a track record of similar trials, the trial court's superiority determination was purely speculative. *Id.* The plaintiffs' potential recovery was also fairly high. *Id.* It is against this very different background that the *Castano* court made the statement on which appellants rely.[17]

There are no novel, alleged or otherwise, theories of law or damages here. In contrast to *Castano,* the damages here are relatively small, and, while Cooper seeks punitive damages, he has dropped any Deceptive Trade Practices Act [18] allegations. Because the contaminated gasoline was distributed within a 100–mile radius and no choice-of-law issues exist, the managerial problems facing the *Castano* court do not exist here. While no other lawsuits exist, we do not find this dispositive. In *Weatherly,* for example, the court held no presumption arose that other class members were uninterested in their claims (and, therefore, not numerous enough) simply because only three had filed suit or intervened. *Weatherly,* 905 S.W.2d at 654. Despite these numbers, it later held a class action would be superior. *Id.* at 654–55.

 Appellants also claim it will be difficult to manage the class action because there is allegedly no way to identify individual class members or give them notice. Rule 42 requires the trial court to devise only the "best notice practicable under the circumstances," including individual notice to all members who can be identified through reasonable effort. TEX.R. CIV. P. 42(c)(2). Publication

---

16. *Erie Ry. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

17. "What the district court failed to consider, and what no court can determine at this time, is the very real possibility that the judicial crisis may fail to materialize. [The plaintiffs' claims are based on a new theory of liability and the existence of new evidence]. Until plaintiffs decide to file individual claims, a court cannot,

from the existence of injury, presume that all or even any plaintiffs will pursue legal remedies. Nor can a court make a superiority determination based on such speculation." *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 747–48 (5th Cir.1996) (bracketed sentence omitted from appellants' brief).

18. TEX. BUS. & COM.CODE ANN. § 17.41 (Vernon 1987).

notice is not precluded. The tainted gasoline was distributed within a 100–mile radius, so that publication notice can be targeted to that area. Notwithstanding, appellants argue those receiving notice will not know if they bought tainted gasoline or if they bought appellants' gasoline, so that the court will have to wade "through a morass of claims" unrelated to appellants. Appellants overlook that the same was true during their voluntary claims procedure, yet they were able efficiently to determine which claims resulted from their gasoline and which did not. There is no reason the trial court and Cooper cannot now do the same. Potential claimants will know if they bought tainted gasoline, because they will have suffered the tell-tale damages discussed above. If they suffered these damages after buying gasoline on the dates and from the retailers to which appellants distributed their gasoline, they bought appellants' tainted gasoline. At this early stage, the trial court could rationally have concluded sorting through claims would not be the "morass" appellants predict.[19]

Here, some discovery (though not extensive) has already taken place. We have already held the trial court did not err in finding joinder would be impracticable, even though the members live within a 100–mile radius. The trial court could rationally have concluded that the class members have an interest in resolving the common issues discussed above and that requiring separate litigation of these would be less efficient. We have read each case cited by appellants and virtually every Texas class action case, and we find none that would require us to find the trial court abused its discretion under these facts. Because we have no fact findings to enlighten us, and because the above evidence supports the trial court's decision, we must conclude the trial court did not abuse its discretion in finding superiority.

Accordingly, we overrule point of error three.

### E. Typicality

■■■■ In point of error four, appellants claim the trial court erred in certifying the class because Cooper's claims are not typical of other class members'. *See* TEX.R. CIV. P. 42(a). To show "typicality," the representative does not have to show his claims or defenses are identical to those of other class members. *Employers Cas.*, 886 S.W.2d at 475. The claims need be only substantially similar. *Chevron U.S.A., Inc. v. Kennedy*, 808 S.W.2d 159, 162 (Tex.App.—El Paso 1991, writ dism'd w.o.j.). A nexus must exist between the representative's injuries and those of the other class members. *Dresser*, 847 S.W.2d at 372.

Appellants again urge that the defenses of release and accord and satisfaction applicable to class members other than Cooper necessarily prevent Cooper's claims from being typical. We agree with those Texas courts rejecting this contention. *See Glassell v. Ellis*, 956 S.W.2d 676, 685 (Tex.App.—Texarkana 1997, writ requested); *Jackson*, 928 S.W.2d at 588; *Dresser*, 847 S.W.2d at 373; *Adams*, 791 S.W.2d at 290–91; *but see Weatherly*, 905 S.W.2d at 653.

Appellants also argue that, because Cooper did not have receipts for his trucks' repairs, his claim would be substantially weaker than that of class members having receipts. However, the record contains receipts of work done to Cooper's trucks, supported by his testimony and his mechanic's affidavit. In any event, Cooper does not need receipts to have a strong case or to prove up his damages when other evidence will suffice. This argument is without merit.

■■■■ Appellants also argue Cooper's claims are not typical because (1) he purchased a large amount of gasoline and (2) the contamination level of the gasoline he purchased may not be the same as that purchased by other class members. Regardless, Cooper's claims need only show a nexus between the injury he suffered and that suffered by other class members. *Dresser*, 847 S.W.2d at 372. We have already held that differing contamination levels do not necessarily defeat commonality, because similar damages affected all members, including

---

**19.** We note that, if giving notice is really the morass appellants claim, the same would be true for their continued claims procedure, which they argue is superior to a class action.

Cooper.[20] That is, liability might be shown by the damages incurred, not necessarily by the contamination level. The trial court would not have abused its discretion in finding this a sufficient nexus between Cooper's damages and those of other class members.

Cooper did not have to make a comprehensive showing of typicality. *Weatherly,* 905 S.W.2d at 647. His trucks were damaged by the same gasoline contaminant, and from the same incident, as that damaging other class members' vehicles. His damages were similar to those generally caused by this contamination. The common questions examined earlier run through all class members' claims, including Cooper's. This showing supports a conclusion that the trial court acted within its discretion, especially where appellants did not obtain fact findings.

Accordingly, we overrule point of error four.

### F. Adequacy of Representation

▮ In point of error five, appellants claim the trial court erred in certifying the class because Cooper is not an adequate class representative and his attorneys are not adequate class counsel. *See* TEX.R. CIV. P. 42(a). The adequacy of representation requirement consists of two elements: (1) it must appear that the representatives, through their attorneys, will vigorously prosecute the class claims and (2) there must be an absence of antagonism or conflict between the representative's interests and those of the class members. *Kirkland,* 917 S.W.2d at 844.

▮ Factors affecting this determination include the following: (1) counsel's adequacy, (2) potential conflicts of interest,[21] (3) the plaintiff's personal integrity, (4) the representative's familiarity with the litigation and

his belief in the grievance's legitimacy, (5) whether the class is unmanageable, based on geographical limitations, and (6) whether the plaintiff can afford to finance the class action. *Forsyth v. Lake LBJ Inv. Corp.,* 903 S.W.2d 146, 151 (Tex.App.—Austin 1995, writ dism'd w.o.j.) (op. on reh'g).

Appellants point to the following deficiencies they claim make Cooper an inadequate representative: (1) there was no evidence whether Cooper could afford to prosecute a class action, (2) Cooper handled his own claim poorly, because he did not present complete documentation to LMCS before filing suit, (3) there were discrepancies in Cooper's testimony about what repairs were done on his trucks, (4) Cooper did not investigate much during the seven months between the suit's filing and the certification, and (5) he did not tell those whom he interviewed about appellants' claims procedure.[22]

▮ Cooper testified he was willing to do whatever it took to prosecute the lawsuit, to compensate other class members for what he believed were legitimate grievances. He was interested enough to testify at the certification hearing and to interview some potential class members personally. He has lived in the same county for over 50 years and has never been arrested. While Cooper had contacted only a few potential class members, his certification motion was filed only three months before the hearing, and the lawsuit had been filed only three months before. No potential class members, including those interviewed by Cooper, stated they opposed certification. All class members lived within a 100–mile radius, making the class manageable. While Cooper did not testify about his finances, the trial court may name additional representatives if the class action's financial burdens become too great. *See* TEX.R. CIV.

---

**20.** For this reason, *McElhaney v. Eli Lilly & Co.,* cited by appellants, is distinguishable. *See id.,* 93 F.R.D. 875, 878–79 (D.S.Dakota 1982).

**21.** A speculative conflict does not suffice to show an abuse of discretion. *Employers Cas.,* 886 S.W.2d at 476. The conflict must go to the litigation's very subject matter. *Dresser,* 847 S.W.2d at 373.

**22.** Appellants also argue Cooper's claims were atypical, as previously discussed, creating an an-

tagonism with other class members' claims. We have already held there was no abuse of discretion in finding Cooper's claims *were* typical; therefore, there was no abuse of discretion in finding no intra-class antagonism existed. Appellants do not argue any other grounds for intra-class antagonism, and the remainder of their attack concerns whether Cooper and his counsel will vigorously protect other class members' claims.

P. 42(c)(1); *Wiggins v. Enserch Exploration, Inc.*, 743 S.W.2d 332, 336 (Tex.App.—Dallas 1987, writ dism'd w.o.j.); *Salvaggio v. Houston Indep. Sch. Dist.*, 709 S.W.2d 306, 310 (Tex.App.—Houston [14th Dist.] 1986, writ dism'd w.o.j.). We conclude the trial court did not abuse its discretion in determining Cooper would be an adequate representative.

Appellants also claim class counsel is inadequate. They argue (1) Cooper presented no evidence of his counsel's qualifications, (2) counsel handled Cooper's claim poorly, mainly because they have not investigated much, and (3) class members who have not settled would probably prefer a voluntary claims procedure to a class action, creating a conflict between counsel and these members.

 Because the record contains nothing to support the third argument (conflict with counsel), we would be speculating were we to agree with appellants on it. As for the first argument, Cooper's counsel made the following, unsworn representation to the trial court:

> So my partner has been licensed to practice 15 years. He is a board certified A–V rated attorney. I have been licensed approximately six to seven years. I have first-chaired approximately 10 trials. Second-chaired I don't know how many. I probably handled or resolved thousands of cases. I'm sure my partner is a multiple of that. So we would submit there is no genuine issue as to our adequacy to properly represent this class.

Appellants correctly note this statement was not *evidence*. However, a trial court may consider material that is not evidence in determining whether to certify a class. *See, e.g.,* *St. Louis Southwestern Ry. v. Voluntary Purchasing Groups, Inc.*, 929 S.W.2d 25, 30–31 (Tex.App.—Texarkana 1996, no writ). These representations of counsel, who was also an officer of the court, were sufficient "material" to support the trial court's determination.

Overall, although some factors weigh against finding Cooper and his counsel would adequately represent the class, others weigh in favor of it. Given these facts, and that appellants did not request specific findings to shed light on the trial court's reasoning, we cannot say the trial court abused its discretion in finding appellant and his counsel to be adequate representatives. *See Franklin v. Donoho,* 774 S.W.2d 308, 316 (Tex.App.—Austin 1989, no writ) (finding no abuse of discretion where record suggested reasonable basis for finding adequate representation and where there were no fact findings).

Accordingly, we overrule point of error five.

### G. Feasibility of Giving Notice to Class Members

In point of error six, appellants contend the trial court erred in not considering, for purposes of superiority, whether adequate notice could be given to class members. This is an attack on the class certification order, which does not recite any such findings or conclusions.

Appellants did not obtain either a fact finding or a conclusion of law on the feasibility of notice to class members. Appellants have not shown the undisputed evidence negates feasibility of notice, and there was adequate evidence to support such a finding. Therefore, we must presume the trial court considered feasibility of notice in deciding a class action would be the superior method. *See Petty,* 778 S.W.2d at 160–61. Accordingly, we overrule point of error six.

### Conclusion

We applaud appellants' admirable, proactive claims procedure. That appellants made this effort, however, is not an absolute guarantee against the later certification of a class. It is irrelevant whether this Court believes this class should have been certified or whether it would have defined the class this way. We simply cannot substitute our judgment for that of the trial court, in light of the above considerations. *See Dresser,* 847 S.W.2d at 371.

Accordingly, we affirm the class certification order.