NUMBER 13-03-267-CV

 

                         COURT OF APPEALS

 

               THIRTEENTH DISTRICT OF TEXAS

 

                  CORPUS CHRISTI - EDINBURG

 

 

 

CITGO REFINING AND
MARKETING, INC., 

AND CITGO PETROLEUM CORPORATION,                   Appellants,

 

                                           v.

 

AMELIA GARZA, ET AL.,                                           Appellees.

 

 

 

             On appeal from the 28th District Court

                     of Nueces County, Texas.

 

 

 

               O P I N I O N 
ON  R E H E A R I N G

 

                         Before Justices
Hinojosa, Yañez, and Castillo

                                  Opinion by Justice Castillo

 








We reaffirm our opinion which issued
September 30, 2005, except to the extent it concluded that we did not need to
reach the issue of whether or not class certification was appropriate.  We here address Citgo's contention on appeal
that the trial court abused its discretion in (1) initially certifying the
matter as a class action (urging that common issues do not predominate and the
requisite vigorous analysis was never performed), and (2) failing to recognize
later changed circumstances and decertify the class.  In our previous opinion, we reversed and
remanded for further proceedings.  We
grant Citgo's motion for hearing, expanding the issues to be considered upon
remand, and direct the trial court to conduct the requisite rigorous analysis
with respect to the motions to decertify, based on the changed circumstances of
the case.  

I. 
Background

The history of this litigation has been
extensively set forth in our opinion of September 30, 2005.  With respect to certification, the record
reflects that the trial court held a hearing on those issues beginning on
October 19, 1995.  Plaintiff class claims
centered on permanent damage to real property and diminution in value, based on
negligence, trespass, and nuisance.  The
class was originally certified in November 1995.[1]








Two interlocutory appeals addressed the
certification question, the first challenging the original 1995 certification
order.  This Court's opinion in Amerada
Hess Corp. v. Garza, 973 S.W.2d 667 (Tex. App.BCorpus Christi 1996), pet. dism'd
w.o.j., Coastal Corp v. Garza, 979 S.W.2d 318 (Tex. 1998),
considered only whether the trial court had appropriately addressed and had not
abused its discretion in determining that, at that point in the litigation, the
requisites of rule 42 appeared to have been satisfied.  A second interlocutory appeal was later
brought to determine whether an order of notice to the class constituted a
fundamental alteration in the nature of the class.  See Citgo Refining and Mktg., Inc. v.
Garza, 94 S.W.3d 322 (Tex. App.BCorpus Christi 2002, no pet.).

In our opinion of September 30, 2005, we rejected
appellees' contention that these earlier reviews of the class certification
issue preclude us from considering it further. 
None of those appeals, in our view, constitute law of the case or
preclude us from considering certification issues. 

While the second interlocutory appeal
remained pending, many defendants settled with the plaintiff class, and on
January 23, 1998, the trial court issued an order severing all claims against
those settling defendants.  In February
1998, because the trial court had not yet approved the proposed settlement
between Citgo and the class, Citgo initiated an independent buyout of the
properties located in the Oak Park Triangle.[2]  The remaining defendants, other than Citgo,
were severed out of the case in January 2000. 
Although differently-defined classes were crafted for many of the
settling defendants, the original class structure, as set out in the
certification order of November 1995, remains in effect for Citgo and all class
members.  

 








II. 
Rule 42 and Class Certification

A. 
Standard of Review

Although we discuss the propriety of the
class certification in light of the claims asserted by the named plaintiffs, we
in no way evaluate the merits of these claims.  See Intratex Gas Co. v. Beeson, 22 S.W.3d
398, 404 (Tex. 2000) ("Deciding the merits of the suit in order to
determine . . . its maintainability as a class action is not
appropriate.").  No automatic right
exists to maintain a lawsuit as a class action. 
Southwestern Ref. Co. v. Bernal, 22 S.W.3d 425, 439 (Tex. 2000)
(quoting Sun Coast Res., Inc. v. Cooper, 967 S.W.2d 525, 529 (Tex. App.BHouston [1st Dist.] 1998, pet. dism'd
w.o.j.)).








Our review of a decision on a class
certification order is limited to determining whether the trial court's order
constituted an abuse of discretion.  Ford
Motor Co. v. Ocanas, 138 S.W.3d 447, 451 (Tex. App.BCorpus Christi 2004, no pet.); see also Henry Schein, Inc. v. Stromboe,
102 S.W.3d 675, 691 (Tex. 2002).  In
reviewing a trial court's decision under an abuse of discretion standard, we
must determine whether the trial court acted without reference to any guiding
rules or principles.  Downer v.
Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985).  The exercise of discretion is within the sole
province of the trial court, and an appellate court may not substitute its
discretion for that of the trial judge.  Johnson
v. Fourth Ct. App., 700 S.W.2d 916, 918 (Tex. 1985).  Rather, an abuse of discretion occurs only
when the trial court reaches a decision that is "so arbitrary and
unreasonable as to amount to a clear and prejudicial error of law."  Id. at 917. 

Typically, under this standard of review,
the appellate court must indulge every presumption favorable to the trial
court's ruling.  Fid. and Guar. Life
Ins. Co. v. Pina, 165 S.W.3d 416, 422 (Tex. App.BCorpus Christi 2005, no pet.) (citing
Graebel/Houston Movers, Inc. v. Chastain, 26 S.W.3d 24, 29 (Tex. App.BHouston [1st Dist.] 2000, pet dism'd
w.o.j.)).  On certification issues,
however, the appellate court is not bound by this presumption and must
independently determine whether the requirements of rule 42 have been fully
satisfied.  Pina, 165 S.W.3d at
422; Ocanas, 138 S.W.3d at 451; see also Schein, 102 S.W.3d at
691 ("Compliance with Rule 42 must be demonstrated; it cannot be
presumed."); Bernal, 22 S.W.3d at 435.  The supreme court has expressly rejected the
approach of "certify now and worry later."  Schein, 102 S.W.3d at 690; Bernal,
22 S.W.3d at 435.  The plaintiffs bear
the burden of showing their entitlement to certification.  See Sun Coast Res., 967 S.W.2d at 529;
Glassell v. Ellis, 956 S.W.2d 676, 682 (Tex. App.BTexarkana 1997, pet. dism'd w.o.j.).  








The trial court must conduct a
"rigorous analysis" to determine whether certification requirements
have been met.  Bernal, 22 S.W.3d
at 435; accord, Schein, 102 S.W.3d at 688.  This rigorous analysis must include
indicating how the claims will likely be tried so that conformity with rule 42
can be meaningfully evaluated.  Schein,
102 S.W.3d at 688.  Courts are to
"go beyond the pleadings" and understand the "claims, defenses,
relevant facts, and applicable substantive law" in order to make a
meaningful determination that the requirements of certification have been
met.  Bernal, 22 S.W.3d at
435.  

Further, we agree that the requirements of Bernal
are appropriately applied to determine whether class certification is
proper.  See State Farm Mut. Auto Ins.
Co. v. Lopez, 156 S.W.3d 550, 556 (Tex. 2004) (holding that the analysis
required by Bernal is properly applied even where a certification order
issued prior to Bernal).  Accordingly, we perform that analysis
here.  

                                    B.  The Nature of Class Actions

The class action serves as a mechanism to
eliminate or reduce the threat of repetitive litigation, prevent inconsistent
resolution of similar cases, and provide a means of redress for individual
claims that are too small to make independent actions economically viable.  Ford Motor Co. v. Sheldon, 22 S.W.3d
444, 452 (Tex. 2000).  A principal
purpose of the class action device is efficiency and economy of
litigation.  See id. (discussing
the origins and general design of the class action device).  When properly used, a class action saves the
court's and the parties' resources by allowing class-wide issues to be tried in
an economical fashion.  See id.
(citing Gen. Tel. Co. v. Falcon, 457 U.S. 147, 155 (1982)).








Thus, class actions furnish an efficient
means for numerous claimants with a common complaint to obtain a remedy
"where it is not economically feasible to obtain relief within the
traditional framework of a multiplicity of small individual suits for
damages."  Gen. Motors Corp. v.
Bloyed, 916 S.W.2d 949, 952 (Tex. 1996) (citing Deposit Guar. Nat'l Bank
v. Roper, 445 U.S. 326, 339 (1980)). 
Class actions also facilitate the spreading of litigation costs among
numerous litigants with similar claims.  Bloyed,
916 S.W.2d at 953 (citing U.S. Parole Comm'n v. Geraghty, 445 U.S.
388, 403 (1980)).  

However, the class-action format
"must not unduly restrict a party from presenting viable claims or
defenses without that party's consent." 
Bernal, 22 S.W.3d at 435-36 (citing Tex. R. Civ. P. 815; Tex.
Gov=t Code Ann. ' 22.004(a)[3]
(providing that state procedural "rules may not abridge, enlarge, or
modify the substantive rights of a litigant.")).  Accordingly, the class-action device may not
alter the parties' burden of proof, right to a jury trial, or substantive
prerequisites to recovery.  Bernal, 22
S.W.3d at 437. 

A trial court's decision to certify a
class can have "staggering economic consequences."  Schein, 102 S.W.3d at 701 (O'Neill,
J., dissenting).  Thus, even though it is
an efficient device, the right to litigate a claim as a class action is not
unfettered; a trial court may certify a class action only if the plaintiff
satisfies the requirements of the rule.  Tex. R. Civ. P. 42; Sheldon, 22
S.W.3d at 452‑53 (citing Weatherly v. Deloitte & Touche, 905
S.W.2d 642, 647 (Tex. App.BHouston [14th Dist.] 1995, writ dism'd
w.o.j.), mandamus denied, 951 S.W.2d 394 (Tex. 1997)). 

C. 
The Statutory Requirements for Certification








A member of a class may sue or be sued as
a representative party of the class only if all of the following requirements
of Texas Rule of Civil Procedure 42(a) are satisfied:  (1) the class is so numerous that joinder of
all members is impracticable; (2) there are questions of law or fact common to
the class; (3) the claims or defenses of the representative parties are typical
of the claims or defenses of the class; and (4) the representative parties will
fairly and adequately protect the interests of the class.  Tex.
R. Civ. P. 42(a).  Additionally,
at least one of the enumerated requirements set forth in rule 42(b) must be
met:  (1) adjudication of separate
actions would create a risk of inconsistent results or impairment of the
interests of other members not parties to the adjudication; (2) the defendant
has acted or refused to act on grounds applicable to the entire class; (3) the
object of the action is the adjudication of claims affecting specific property
involved in the action; or (4) common questions of law or fact predominate over
any questions affecting only individual members, and a class action is the superior
method of fairly and efficiently adjudicating the controversy.  Tex.
R. Civ. P. 42(b).   

When reviewing the merits of the court's
decision, we are limited to considering the material that was before the court
at the time that it ruled.  Lebron v.
Citicorp Vendor Fin., 99 S.W.3d 676, 679 (Tex. App.BEastland 2003, no pet.); Monsanto Co.
v. Davis, 25 S.W.3d 773, 781 (Tex. App.BWaco
2000, pet. denied).  








Rule 42 is patterned after its federal
counterpart.  Bernal, 22 S.W.3d at
433; compare Fed. R. Civ. P. 23
with Tex. R. Civ. P. 42.  Consequently, federal decisions and
authorities interpreting current federal class-action requirements are
persuasive authority in applying rule 42. 
Bernal, 22 S.W.3d at 433.

1. 
Numerosity

A putative class, to satisfy the
numerosity requirement, must show that "the class is so numerous that
joinder of all members is impracticable." 
Bernal, 22 S.W.3d at 433. 
The determination of the numerosity issue is not based on numbers
alone.  In Chastain, the court
stated:

The test is whether joinder of all members
is practicable in view of the size of the class and such factors as judicial
economy, the nature of the action, geographical location of class members, and
the likelihood that class members would be unable to prosecute individual
lawsuits.

 

Chastain, 26 S.W.3d at 29, 32 (citing Weatherly v. Deloitte & Touche,
905 S.W.2d 642, 653 (Tex. App.BHouston [14th Dist.] 1995, writ dism'd
w.o.j.)).  

2.  Typicality








Typicality
requires that "the claims or defenses of the representative parties are
typical of the claims or defenses of the class."  Bernal, 22 S.W.3d at 433.  A class representative must possess the same
interests and suffer the same injury as unnamed or absent class members.  Falcon, 457 U.S. at 156; State Farm
Mut. Auto Ins. Co. v. Lopez, 45 S.W.3d 182, 191 (Tex. App.BCorpus Christi 2001), rev'd on other
grounds, 156 S.W.3d 550 (Tex. 2004). 
To be typical, class representatives' claims need not be identical, but
must arise from the same event or course of conduct giving rise to the claims
of other class members and must also be based on the same legal theories.  Weatherly, 905 S.W.2d at 653.  Other courts have described this as a
requisite "nexus between the injury suffered by the representative and the
injuries suffered by other members of the class."  Dresser Indus., Inc. v. Snell, 847
S.W.2d 367, 372 (Tex. App.BEl Paso 1993, no writ). 

3.  Adequacy

The adequacy of
representation requirement consists of two elements:  (1) it must appear that the representatives,
through their attorneys, will vigorously prosecute the class claims; and (2)
there must be an absence of antagonism or conflict between the representatives'
interests and those of the class members. 
Chastain, 26 S.W.3d at 32 (citing Sun Coast Res., 967
S.W.2d at 538).  Determining adequacy of
representation includes a consideration of the following factors:  (1) counsel's adequacy, (2) potential
conflicts of interest, (3) the plaintiff's personal integrity, (4) the
representatives' interests and those of the class members, (5) whether the
class is unmanageable, and (6) whether the plaintiff can afford to finance the
class action.  Chastain, 26 S.W.3d
at 32; Forsyth v. Lake LBJ Investment Corp., 903 S.W.2d 146, 151 (Tex.
App.BAustin 1995, writ dism'd w.o.j.). 

4.  Commonality








The proponent of
class certification must establish that there are questions of law or fact
common to the class.  Tex. R. Civ. P. 42(a); Bernal,
22 S.W.3d at 433.  "Questions common
to the class" are questions that, when answered as to one class member,
are answered as to all class members.  Rio
Grande Valley Gas Co. v. City of Pharr, 962 S.W.2d 631, 641 (Tex. App.BCorpus Christi 1997, pet. dism'd
w.o.j.).  This requirement does not mean
that all or even a substantial portion of the legal and factual questions must
be common to the class.  A single common
question may provide adequate grounds for a class action under appropriate
circumstances.  Id.; see Sun
Coast Res., 967 S.W.2d at 532 ("The threshold of 'commonality' is not
high.") (quoting Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 472
(5th Cir. 1986)).  In most cases in which
appellate courts have found an absence of commonality, the opinions have
emphasized the great factual diversity of the individual claims and the
ultimate dependence of any common legal questions on the facts of each
individual claim.  See, e.g., Bernal,
22 S.W.3d at 436. 

5.  Rule 42(b)BPredominance and Superiority

In addition to
satisfying the requisites of rule 42(a), the class representative is required
to demonstrate that a class action is maintainable because it satisfies one of
the requisites of rule 42(b).  See Tex. R. Civ. P. 42(a); 42(b).  Here, although there is no specific finding,
argument centered on and the record reflects that certification was based upon
satisfaction of the present rule 42(b)(3), that common questions of law or fact
predominated over individual issues.[4]  








The commonality
requirement under rule 42(a) is distinguished from the more stringent provision
of rule 42(b)(3) that common questions of law or fact must predominate over
questions involving individual members.  Tex. R. Civ. P. 42(a); Tex. R. Civ. P. 42(b)(3); Bernal,
22 S.W.3d at 433.  Predominance is
"one of the most stringent prerequisites to class certification;" its
exacting standards act "as a check on the flexible commonality test under
Rule 42(a)(2)."  Bernal, 22
S.W.3d at 435.  

A non-exhaustive list
of factors relevant to the predominance inquiry includes (1) the interest of
members of the class in individually controlling the prosecution or defense of
their particular actions, (2) the extent and nature of any litigation
concerning the controversy already commenced by or against members of the
class, (3) the desirability or undesirability of concentrating the litigation
of the claims in the particular forum, and (4) the difficulties likely to be
encountered in the management of a class action.  Tex.
R. Civ. P. 42(b)(4); Bernal, 22 S.W.3d at 433-34.  The test for establishing predominance of
common issues is whether those issues will be the object of most of the efforts
of the parties and the court, not whether common issues outnumber individual
issues.  Id. at 434.

A trial court
ruling on commonality and predominance must first identify the substantive
issues controlling the litigation's outcome. 
Chastain, 26 S.W.3d at 33. 
The purpose of this requirement is to determine whether the character
and nature of the case satisfy the requirements of the class-action procedural
rule, not to weigh the substantive merits of each class member's claim.  Id. 


Next, the trial
court must correctly identify the elements of the named plaintiffs' causes of
action.  Then,

The question the court must decide before
certifying a class, after rigorous analysis and not merely a lick and a prayer,
is whether the plaintiffs have demonstrated that they can meet their burden of
proof in such a way that common issues predominate over individual ones.  








Schein, 102 S.W.3d at 694.  

As to the effect
of damages calculations on commonality and predominance, the fact that damages
must be computed separately for each class member does not necessarily mean in
itself that individual issues predominate over common issues of law and
fact.  Sun Coast Res., 967 S.W.2d
at 534.  Nor will the existence of
affirmative defenses prevent class certification.  Chastain, 26 S.W.3d at 30; see,
e.g., Manning, 914 S.W.2d at 613-14 (including affirmative defenses of
contributory negligence, superseding cause, and failure to comply with
warranty); Dresser Indus., 847 S.W.2d at 373 (including affirmative
defenses of limitations, lack of misrepresentation, and ratification). 








Finally, a class
action must be the superior means by which to address the claims.  Superiority exists when "the benefits of
class-wide resolution of common issues outweigh any difficulties that may arise
in the management of the class."  Union Pac. Res. Group, Inc. v. Hankins, 51
S.W.3d 741, 754 (Tex. App.BEl Paso 2001), rev'd on other grounds,
111 S.W.3d 69 (Tex. 2003); Chastain, 26 S.W.3d at 34.  In determining whether a class action is
superior, factors the trial court may consider include (1) class members will
benefit from the discovery that has already been completed, thereby eliminating
duplication of effort, (2) the trial court has already spent substantial time
and effort becoming familiar with the issues of the case, which weighs
favorably for a fair and expeditious result, and (3) class members have an
interest in resolving common issues by class action.  Hankins, 51 S.W.3d at 754-55; Chastain,
26 SW.3d at 35.

III.  The Original Class Certification in 1995

A.  The Proceedings

The initial
certification hearing took place over two lengthy days in October 1995.  Extensive briefing and evidence were
submitted by all parties.  Counsel for
the plaintiff class urged that numerosity was satisfied, inasmuch as more than
thirteen thousand people, with approximately four thousand separate family
units or pieces of property, were within the requested geographic boundaries
and definition of the plaintiff class. 
Claims (including diminished property values) were alleged to arise out
of the same practice or course of conduct on the part of the defendants and to
be common to all.  It was urged that the
key issue that would predominate and encompass the bulk of the litigants'
efforts was to "what extent and in what amounts defendants negligently and
intentionally discharged toxic chemicals into the plaintiff class's
environment."  The plaintiff class
urged that issues of the existence and extent of any discharges, as well as
impact on real estate values (which could be crafted over the plaintiff class
by a mathematical model), would be common to the plaintiff class and
predominate.[5]  








Class
representatives, as owners of property within the proposed plaintiff class
boundaries exposed to the defendants' alleged negligent and nuisance activities
with the resultant air and groundwater pollution, were presented as having
claims typical of the plaintiff class.[6]  Representatives and counsel were also
presented as being adequate to ensure vigorous prosecution of the suit, with no
internal conflicts within the plaintiff class. 
Class representatives were located throughout the area.  Class certification was urged as appropriate
and superior, and as the only means by which many of these lower-income people
could bring forward a suit.  

The plaintiff
class presented extensive evidence in support of its motion for certification,
including (1) evidence that spills at various facilities did occur, (2)
numerous affidavits and reports of experts relating to air particulate and
groundwater emissions, pollution, contamination, and dispersion modeling,[7]
and (3) communications from the Nueces County Appraisal District reflecting
reduced property values in the Oak Park Triangle area directly attributable to
the presence of pipelines, and pollution or contamination.








Testimony at the
hearing included that of some proposed class representatives.  Ms. Simms expressed familiarity with the
issues involved, a history of trying to rectify the problem short of
litigation, familiarity with the claims of her neighbors, and a zeal to
maintain that involvement in the capacity of class representative.  She also testified that neither she nor her
neighbors could afford to independently pursue litigation against the
defendants.  Reverend Verlon Friar,
another long-time resident who was well-known in his neighborhood, also
displayed familiarity with and knowledge of the basic tenets and status of the
suit. 








The defendants,
including Citgo, urged that they were not a unified block, inasmuch as the
facilities in issue had been constructed or purchased at different times and
served different functions; the various alleged contaminants could not have
originated uniformly with all of the defendants, and instead issued from
different sources at different times. 
Defendants urged that resultant problems with assessing comparative
responsibility strongly undermined common issues and any usefulness that
certification might otherwise serve. 
Defendants also tendered argument and expert testimony challenging the
proposed medical monitoring class.  They
expressed concerns with how the case could be tried and stressed the
difficulties in determining property values on a class-wide basis, suggesting
that the court proceed instead with bell-weather trials.  Evidence submitted to counter arguments of
the proposed plaintiff class included EPA documents, deposition testimony,
affidavits and reports of various experts challenging the plaintiffs' emissions
analysis and air dispersion modeling (both in theory and application),[8]
and therefore the proposed plaintiff class boundaries.  Defendants tendered expert testimony of a
real estate appraiser who contended that properties he examined as a sample
were neither common nor typical of all those proposed to be included in the
plaintiff class, that not all properties had sustained groundwater
contamination,[9]
and not all diminution in value could be attributed to location.  Defendants contended that the location of
properties, their varying neighborhoods, the distinction between residential or
commercial uses, and the individual perceptions of the various owners created
problems that could not adequately be addressed by crafting subclasses and
militated against any class certification. 
Defendants also urged that the existence of nuisance claims, with the
potential defense of the statute of limitations, meant that individual issues
would predominate. 








A rebuttal witness
for the plaintiff class, Dr. Smith, testified as to economics and cost-benefit
analysis with respect to property valuations. 
His model, based on market analyses and appraisal values,[10]
took into consideration that all properties in the proposed plaintiff class
were not affected in an equal manner.  He
was able to craft his model estimating percentage impact on or loss to
valuation from pollution based on a property's distance from the facilities in
issue.  He spoke of general diminution in
value as a whole of approximately 23% over the proposed plaintiff class area,
with a very sharp increase in diminution of value of up to 60% as one
approached the facilities.  Demarcation
lines corresponded to some of the city streets and highways.  He specifically noted differences near boundaries
such as I-37, Agnes, Port, and Leopard streets. 
He testified that percentage injury would be nearly the same to
properties in proximal distance from the facilities, regardless of the use or
any special attributes of the property.[11]

The trial court issued
an order certifying the plaintiff class on November 14, 1995, composed of three
classes and various subclasses:

(1) All persons who, as of June 1, 1991,
were vested with fee title to real property zoned for single family residential
use within the following geographical area bounded by Interstate Highway 37 on
the South; Navigation Boulevard on the West; the Defendants' Properties on the
North and North Port on the East [the "I-37 North Class"].  Each class member shall, with respect to each
separate residential property owned by such class member also be a member of an
I37 North Class Acquisition Date Subclass. 
A class member may also be a member of the I37 North Free Phase
Hydrocarbon Property Damage subclass [the "Oak Park Triangle Class"];
and[12]

                                                     








(2) 
All persons who, as of June 1, 1991, [are] members of the I37 North
Residential Property Damage Class and whose real property within that class
overlies and/or has been contaminated by the subsurface plume of toxic
contaminates which geographical area is not greater than the area of the
striped triangle on the Property Damage Class Map in Plaintiff's Exhibit 31
[the "Oak Park Triangle Class"];[13]

 

(3) All persons who, as of June 1, 1991,
owned real property zoned for single family residential use within the
following geographical area bounded by the Agnes Street on the South, Baldwin
Boulevard/ Navigation Boulevard on the West, Interstate Highway 37 on the North
and Port Street on the East [the "I-37 South Class"].  Each class member shall be, with respect to
each separate residential property owned by each such class member, a member of
a Location Subclass.  Each Location
Subclass Member shall also be a member of an I37 south Class Acquisition Date
Subclass.[14]

 

The order
certifying the plaintiff class, in addition to identifying the various classes
and subclasses, states "The Court finds the Plaintiffs have satisfied
their burden of presenting some evidence that reasonable class definitions and
other conditions of Rule 42 are satisfied with respect to the Plaintiffs'
proposed property damage classes."[15]


B.  Analysis








The original
appeal to this Court from the certification order (1) challenged appellees' standing
to sue, (2) charged certification violated the parties' right to a jury trial,
and (3) claimed certification was precluded by comparative responsibility
statutes.  This Court reviewed all
requisite prongs under rule 42, and found no abuse of discretion.  See Amerada Hess Corp. v. Garza, 973
S.W.2d at 680.  In this appeal, Citgo
urges that no rigorous analysis was performed, the trial court did not indicate
how claims would be tried, claims of the class representatives were not
typical, common issues did not predominate, and certification was not the
superior method by which to address these issues. 

We note the
extensive discussion of numerosity, commonality, and typicality presented in
our earlier opinion, Amerada Hess v. Garza, 973 S.W.2d at 674-77.  We agree with our analysis of those
prongs.  The principal changes in class
certification analysis since that 1996 opinion have occurred in connection with
the demand for rigorous analysis and satisfaction of the predominance
requirement.  See Bernal, 22
S.W.3d at 435.  Therefore, our opinion
here focuses on those prongs.  








We have reviewed
the record and conclude first that the trial court did conduct the requisite
rigorous analysis.  It had voluminous
written materials before it at the time of the certification hearing.  Each party had the opportunity to and did
present extensive briefing and evidence addressing all requisite prongs under
rule 42.  The certification hearing
itself consumed two full days and included witness testimony and argument.  The trial court actively participated, making
inquiries where it deemed appropriate to clarify argument and evidence before
it.  The certification order which
ultimately issued did not rest upon pleadings or mere assurances that any
problems with predominance or superiority could be overcome, but rather upon
extensive analysis.  See Schein,
102 S.W.3d at 688 (citing Bernal, 22 S.W.3d at 435).  The subclass structure corresponded to expert
testimony and analysis that was in evidence. 
The court expressly refused to certify claims or a class for medical
monitoring, finding that the plaintiff class failed to satisfy its burden in
that regard.  With respect to property
damage claims and diminution in value, it concluded that common issues of fact
and law predominated.  








We are mindful
that rigorous analysis is not complete without an indication of how the claims
will likely be tried.  Bernal, 22
S.W.3d at 435.  Here, no express trial
plan is included in the trial court's order. 
The trial court does not expressly identify in the order the causes of
action or the substantive issues that will control the case.  See Lopez, 156 S.W.2d at
557.  Nevertheless, we believe that the
key information is apparent from the order, which states the plaintiff class is
certified only as to property damage claims. 
The trial court's structure of classes reflects the substantive issues
that will control structure of the case and essentially accomplishes the same
objectives that would be served by a more express order under Bernal.  See Bernal, 22 S.W.3d at 435.  Classes were created to distinguish between
air pollution and groundwater pollution. 
The subclass structure took into account distance from the facilities in
question, as well as date of acquisition of property.  Each of these factors and subclass structures
were based upon concrete evidence and modeling tendered at the certification
hearing by the plaintiff expert.  The
trial court had the opportunity to hear, weigh and reject testimony of defense
witnesses that individual questions would predominate over common ones.  The trial court could reasonably conclude, as
reflected in the structure of subclasses, that common questions would
predominate and that individual damage issues could be accounted for by proper
modeling and thus would not predominate. 
Those same divisions would guide how the case was presented to a jury. 

We cannot conclude
that the trial court's conclusions, based upon an apparent careful and measured
examination of the issues and facts before it, constituted an abuse of
discretion, even under the auspices of Bernal.

            We note Justice Hecht's concerns in
Garza:  "If common issues of law
and fact did not predominate in RSR because of the necessity of proving
the damage to each tract by a single pollutant from a single source, they
cannot possibly predominate in the present case involving three pollutants from
ten sources."  Garza, 979
S.W.2d at 325 (Hecht, J., dissenting). 
However, as the majority in that case pointed out, RSR Corp. v. Hayes,
673 S.W.2d 928 (Tex. App.BDallas 1984) involved claims for property
damage and personal injury based on pollution from a lead smelter, and was
distinguishable from the underlying matter because of the personal injury
claims:  "[P]ersonal injury mass
tort class actions need to be distinguished from property damage class
actions.  The latter have been more
frequently certified and inherently tend to involve both greater homogeneity
among class members and greater commonality in their factual issues."  Garza, 979 S.W.2d at 321 (citing John
C. Coffee, Jr., Class Wars: The Dilemma of Mas Tort Class Action, 95 Col. L. Rev. 1343, 1344 n.2
(1995)).  The court also noted that the
subclass structure crafted by the trial court in this matter could produce the
commonality of issues lacking in RSR. 
Id. 








With respect to
superiority, evidence reflects that the members of the plaintiff class below
were, for the most part, individuals without resources to bring separate
independent suits, and that those suits would raise virtually the same
questions and involve the same experts and types of analysis.  Evidence reflects that plaintiff class
members had an interest in resolving the common issues by class action.  Further, the record reflects that plaintiff
class members would benefit from discovery already commenced.  Much written discovery and many depositions
of class representatives and other witnesses, as well as of numerous experts,
had already occurred at the time of the certification hearing.  The trial court had invested considerable
time and effort and was certainly familiar with the issues in dispute.  It could reasonably conclude, at the time and
on the record before it, that class certification was not only appropriate but also
was the superior means by which to address the claims.  See Chastain, 26 S.W.3d at 34;
Sun Coast Res., 965 S.W.2d at 535.  

IV.  The Motion to Decertify, Based upon Changed
Conditions

A.  The Proceedings and Case Developments








In October 1999,
Citgo moved to decertify the plaintiff class based upon changed
circumstances.  Citgo urged that
certification was no longer appropriate for numerous reasons.  First, it had conducted the buy-out and secured
releases with respect to virtually all properties in the Oak Park Triangle.  Citgo and Koch together had purchased an
additional 165 properties, paying more than the worth estimated by the
plaintiff class damages expert.  The
purchase of nearly all the Oak Park Triangle subclass properties (which
encompassed all of the hydrocarbon groundwater contamination class claims) and
an additional 165 properties in the Hillcrest area effectively eliminated all
residential properties in close proximity to the facility.[16]  








Secondly, Citgo
urged that case history reflected and plaintiff class counsel had acknowledged
that the 1995 subclasses had played no role in the case, and that the plaintiff
class had effectively abandoned the subclasses in its prosecution of the suit.[17]  Even the plaintiff class damages expert did
not base his later-crafted damage models on the geographical subclasses created
in the 1995 order.  Instead, the
plaintiff class expert opined that damages increased on a continuum as distance
from the closest facility increased. 
Further, no-one attempted to use the acquisition date of a property in
the defined subclasses for any significant purpose.  The plaintiff class expert instead stated
that the date a property may have been acquired played no part in his analysis
because he could not identify when any diminution occurred;[18]
he focused solely on proximity to facilities. 
Citgo additionally pointed to the plaintiff class's response to Koch
Industries, Inc.'s motion for summary judgment (filed August 20, 1999), in
which the plaintiff class stated that the class substructure was solely a
judicial creation to attempt to create commonality, but did not reflect
reality.[19]  The plaintiff class stated: 

Instead that year [1971] is simply one
chosen by the Honorable Robert Pate, the trial court judge who was presiding at
the time the plaintiffs in this case were certified as a class.  In his certification order . . . Judge Pate
unilaterally created a number of different sub-classes based on geography and
duration of ownership.  Presumably, Judge
Pate created the sub-classes in order to enhance commonality or to aid in the
calculation of damages, though it is not clear. 
The plaintiffs never sought the creation of such sub-classes and the
certification order does not identify any reasons for their creation.

 








Third, Citgo urged
that inherent conflicts had arisen between plaintiff class members located
close to facilities and those located at a further distance, destroying
typicality and adequacy of representation. 
Citgo urged these conflicts arose because when the plaintiff class
expert sought to preserve claims of outlying properties, date problems with
respect to when substantial damage occurred necessarily triggered statute of
limitations concerns for properties in close proximity to the facilities.[20]  Additionally, Citgo urged that the combined
effect of (a) the expert's opinion as to when "substantial injury"
occurred, coupled with (b) application of the expert's own discount rate (based
on date of acquisition), and (c) the Citgo buy-out, was that numerosity was
destroyed.  Citgo also pointed to the
plaintiff class's admission that plaintiff class members located 1.069 miles or
more from the facilities had no loss or damage at all. 

Plaintiff class
claims also now encompassed a 1997 event involving a fire at Citgo.  This event occurred years after certification
and did not impact all residences in the plaintiff class in the same manner as
earlier claims (based on groundwater contamination and air pollution from
aggregate emissions over time) might have done. 
Further, claims related to the 1997 event had been separately litigated
by many in the plaintiff class, and they were now barred by res judicata from
resurrecting or recovering again for those same claims.  Inclusion of that event further complicated
proof issues and allocation of damages.[21]  Finally, Citgo urged that many plaintiff
class members had died since certification, and Texas law prohibits recovery of
exemplary damages for injury to real property on behalf of a decedent.  








Citgo urged that
the various changed circumstances had destroyed any earlier commonality,
typicality, adequacy or numerosity. 
Citgo urged that discovery and progression of theories in the case had
exacerbated individual concerns, including when damage became
"substantial," and that these concerns necessarily outweighed and
predominated over any of the originally-hoped-for common issues.

Appellees disputed
Citgo's contentions, conceding only that two factors had changed since the
initial certification:  some of the
plaintiff class had died, and Citgo conducted its buy-out. 

A hearing on the
motion to decertify was held on November 22, 1999.  The plaintiff class essentially argued that
trial was set and justice demanded that it go forward as scheduled in January
2000.  They urged that Citgo only urged
the certification argument as a means to postpone that trial.  The motion was denied on November 24,
1999.  

In January, trial
did not go forward.  Instead the trial
court approved the Citgo settlement first tendered to the court in fall
1997.  In March 2000, the plaintiff class
filed an amended petition and included an alternate claim for breach of the
settlement agreement.  








At a June 2001
pre-trial hearing, the court was again asked to revisit the issue of
decertification, in light of Bernal and the other changes in
circumstances.  The court requested
additional briefing.  On July 6, 2001,
Citgo filed a Supplemental Motion to Decertify, stressing the absence of any
rigorous analysis, any trial plan, and the failure of the plaintiff class, as
defined, to satisfy the requisites of Rule 42.[22]  Citgo urged that potential problems had only
been exacerbated, the class definition, as certified, precluded Citgo from
adequately and vigorously presenting individual defenses,[23]
and that certification was not the superior method by which to resolve
remaining claims.

The plaintiff
class did not respond directly to Citgo's arguments, but urged that the 1995
certification order was still viable, that some members of the Oak Park
Triangle subclass had never settled with Citgo, that modification would only
trigger another appeal, that modification might adversely affect other pending
settlements, that Citgo presented no new arguments, and that the trial court
had already determined that individual issues did not predominate.[24]  As to the absence of a trial plan (as
required under Bernal) the plaintiff class urged that the fact that
trial proceeded against the severed Coastal Corporation defendants adequately
demonstrated that the matter could be tried on the merits and that individual
issues would not predominate.[25]


A bench trial
commenced on August 13, 2001; the trial court did not reopen the hearing,
presumably because the entire issue might become moot depending upon outcome of
the trial.[26]









B.  Analysis

In our 1996
opinion, in which we reviewed the certification issues for the first time, we
noted that "[t]he court has the 'duty of monitoring its class decisions in
light of the evidentiary development of the case . . . [and] must define,
redefine, subclass, and decertify as appropriate in response to file
progression of the case from assertion to facts.'"  Amerada Hess v. Garza, 973 S.W.2d at
673-74.  

It cannot be
disputed that major changes occurred subsequent to the original
certification.  In addition to the shifts
in circumstance identified by the parties is the significant development that
Citgo is the only remaining defendant in the underlying proceedings.  Any complications that might have previously
arisen with respect to multiple defendants and related causation issues are no
longer a concern.  The resultant
simplification of the suit mitigates in favor of retaining certification of the
plaintiff class.








However, the Citgo
buy-out did occur, with the resultant elimination of most of the Oak Park
Triangle Class (formed to address the groundwater contamination issue).[27]  We further cannot ignore that the plaintiff
class, in its 1999 pleadings, stated that class structure and division into
subclasses was simply one chosen by the trial judge and that, while presumably
the subclasses were created "in order to enhance commonality or to aid in
the calculation of damages," the "plaintiffs never sought the
creation of such subclasses and the certification order does not identify any
reasons for their creation."  The
record further reflects that plaintiff class in fact sought to dissolve itself
at one point, presumably because it was not an accurate reflection of the
evidence that had arisen through continuing discovery and expert analysis.  The plaintiff class's own expert did not use
the plaintiff class structure defined in the 1995 order to craft his damages
analysis.  We also cannot ignore the
settlements included in the record which, in resolving claims against other
co-defendants of Citgo, created distinct settlement classes that do not
correspond to the original 1995 certification order or the class definitions
set forth therein.  








The trial court
was presented with motions requesting it to revisit the issue of class
certification in light of the many changed circumstances.  It held one hearing, denied the motion to
decertify, then approved the settlement agreement (which was found to have been
abandoned in our September 30 opinion), and ultimately moved forward with trial
on the breach of contract claim.  Though
requested and presented with new motions, the trial court did not hold an
additional hearing on decertification prior to trial.  We conclude that, in light of the many and
dramatic changed circumstances, regardless of whether they are best considered
under modification or decertification, the trial court abused its discretion in
failing to adequately address the motions to decertify and to conduct the
rigorous analysis demanded by Bernal. 

We note that where
problems arise with a class definition, appellate courts should be reluctant to
step in or redefine the class.  Beeson,
22 S.W.3d at 406.  

[U]nder rule 42(c) (1), the trial court
may alter, amend, or withdraw class certification at any time before final
judgment.  For example, the contours of
the case may change after discovery is completed and as the parties prepare for
trial, necessitating modification of the class definition.  Rule 42(c)(1) invests the trial court with the
responsibility of managing the class action, and provides it with the tools to
respond to changes in the case's development. 
Prescribing the class definition for the trial court, therefore,
interferes with the trial court's discretion to monitor the class. 

 

Id. at 407.  Further, "the
trial court's discretion to define, modify, subclassify, or decertify in
response to the case's development counsels in favor of remanding to the trial
court when an appellate court identifies definitional problems."  Id. 


Conclusion

We grant Citgo's
motion for rehearing.  We expand the
holding in our opinion of September 30, 2005, to include remand to the trial
court for further consideration and rigorous analysis of the motions to
decertify in light of that opinion and the changed circumstances of the
case.  Id.

 

ERRLINDA CASTILLO

Justice

 

Opinion on Rehearing delivered and filed

this 23rd day of March, 2006.

 











[1] The plaintiff class also
originally brought claims for medical monitoring and personal injury, but these
were not included in the certification order. 





[2] See detailed discussion
in Part IV below. 





[3] Tex. Gov=t
Code Ann. ' 22.004(a) (Vernon
2004).





[4] At the time this
plaintiff class was certified, rule 42 contained four subdivisions; rule
42(b)(4) included the language currently found in rule 42(b)(3).  See Tex.
R. Civ. P. 42(b)(4) (1977, amended 2004). 





[5] Evidence tendered for
purposes of class certification suggested that all properties in the affected
area had sustained diminution in market values that far exceeded what would
normally be expected for properties near an encroaching industrial area.  The putative class urged that the adverse
impact on property values was significant and could be measured on a class-wide
basis, while conceding that some individualized damage calculations would be
required, depending upon a property's proximity to the facilities.  





[6] At the time of this
hearing, plaintiffs sought certification of a property damage class (with a
subclass for those exposed to groundwater contamination) and a medical
monitoring class.  Only the property
damage classes were certified and are in issue. 






[7] Also included were
expert affidavits and reports relating to health issues and the claims for
medical monitoring.  Objections to the
evidence were overruled; all evidence was admitted for the single purpose of
determining the appropriateness of class certification.  





[8] Defendants contended
that plaintiff experts had made incorrect assumptions with respect to amounts
of releases and drift characteristics that were fatal to the models relied upon
to establish class-wide characteristics. 






[9] Defendants at the
hearing conceded that hydrocarbon contaminants were located in the ground and
groundwater beneath a bulk of the properties in the Oak Park Triangle.  





[10] Data was based upon 1994
tax appraisal values, but Dr. Smith testified that diminution was a continuous
process over years.  He agreed that
persons who lived further away or who had only recently purchased property
would have sustained less negative impact. 






[11] At the conclusion of
testimony, counsel for the putative class clarified that some class
representatives indeed owned commercial properties within the proposed
plaintiff class area, and additional business owners were ready to serve in the
capacity of representatives, but were also satisfied with those already
proposed as representatives.  Additional
affidavits from both residential and business owners were tendered as evidence
to counter defense arguments that most persons in the affected area were
unconcerned about the issue.  Objections
to the affidavits were overruled. 
Counsel also addressed the superiority of a class action over the
bell-weather trials alternative, including the economic savings that could be
realized if certification did occur.





[12] Subclasses were defined
based upon date of acquisition of property, whether (1) before June 1, 1971,
(2) after June 1, 1971 but before June 1, 1976, (3) after June 1, 1976 but
before June 1, 1981, (4) after June 1, 1981 but before June 1, 1986, and (5)
after June 1, 1986 but before June 1, 1991.





[13] This class was crafted
to deal with the groundwater contamination claims.  





[14] Subclasses were defined
by location of the property in relation to Leopard Street, and date of
acquisition (comparable to the dates identified for the I-37 North Class).





[15] Certification of the
plaintiff class was appealed and affirmed in August 1996.  See Amerada Hess Corp. v. Garza, 973
S.W.2d 667, 671, 682 (Tex. App.BCorpus Christi 1996, writ dism'd w.o.j.). See
also Coastal Corp. v. Garza, 979 S.W.2d 318 (Tex. 1998). 





[16] Citgo pointed out that
the buy-out compensated those property owners in amounts in excess of the
damages identified by the plaintiff class expert, such that they were entitled
to no additional damages, and further provided Citgo with complete releases. 





[17] We would also note that
on January 22, 1998, the plaintiff class moved to dissolve itself, in order to
moot the pending interlocutory appeal. 
That motion was never ruled on and was withdrawn on July 16, 1998,
subsequent to the supreme court's dismissal of the appeal for want of
jurisdiction. 





[18] The expert did
acknowledge that the more recent the acquisition, the greater the discount to
his estimated purchase price, reflecting diminution up to that date.  However, neither the estimated purchase price
nor extent of damage was determined by date of acquisition.  The expert stated that injuries to the
properties became "substantial" over a period between the early
1980's and early 1990's, with the bulk of damages occurring in the mid to late
1990's.





[19] The plaintiff class
notice as it was proposed in 1999 did not reference any of the subclasses, and
referred only to the entire geographical area encompassed within the plaintiff
class. 





[20] Damages for permanent
nuisance require a "material or substantial injury."  See Vestal v. Gulf Oil Corp., 231
S.W.2d 523, 525 (Tex. Civ. App.BFort Worth 1950), aff'd, 235 S.W.2d 487
(Tex. 1951).  The plaintiff class urged
that a cause of action for permanent nuisance accrued when the property
sustained "substantial injury." 
The plaintiff class damage expert opined that severity of impact on
properties directly correlated to distance from the facility, and that by a
certain date, "substantial damage" in the amount of 21% diminution in
value had occurred to properties within a one-third mile radius of the
facility.  The expert projected a growth
rate for this radius over time.  Citgo
urged that this approach necessarily meant that, at the time of the hearing,
property beyond that radius had not yet sustained the requisite
"substantial damage," such that a cause of action had not yet even
accrued.  Further, the plaintiff class
expert conceded that some members of the plaintiff class were so distant from
the facility that they had sustained no damages at all.





[21] Citgo also argued that
numerous members of the plaintiff class had, at different times, been party to
various suits against various defendants for other specific incidents, each
time claiming property damage and diminished value.  While such claims would not necessarily
negate the possibility of recovery in this instance, they could impact those
members' amount of recovery in light of other recoveries they might have
received.





[22] In this supplemental
motion, Citgo notes that although the original certification order created a
subclass of the Oak Park Triangle for alleged groundwater contamination, a rule
11 agreement was later entered into, confirming that such claims would not be
asserted against Citgo.  Additionally, at
the time of this motion, all but one Oak Park Triangle property had been
purchased by Citgo in its buy-out.





[23] At this point in the
litigation, there apparently remained between 2,000 and 3,000 plaintiff class
members.





[24] The plaintiff class
further urged that Citgo's issues would be moot if the plaintiff class
prevailed in its claims for breach of the settlement agreement.





[25] Propriety of the
plaintiff class in the severed case and trial against Coastal Corporation is
not before us; we note, however, the plaintiff class's acknowledgment that
Coastal Corporation also argued that individual issues predominated.  





[26] As noted in our earlier
opinion of September 30, 2005, trial proceeded on the claim for breach of the
settlement agreement.  A hearing on the
question of decertification was set prior to trial before a visiting
judge.  However, an objection to the
judge was lodged; the hearing did not go forward.  Although the issue was brought up before the
trial court, it was not resolved before trial commenced. We reject the
contention that the issue was waived.  At
all points in the process, Citgo raised motions in opposition to the class, and
requested either decertification or a new hearing.  In April 2002, Citgo objected to the proposed
class notice (relating outcome of the trial); Citgo even brought an interlocutory
appeal which was rejected as premature. 
In September 2002, the court held a hearing on the motion for entry of
judgment and attorneys' fees.  Following
this hearing, the plaintiff class tendered a proposed final judgment to which
Citgo objected based upon conflicts in the class and arguments for
decertification.  Once final judgment
issued in April 2003, this appeal ensued. 






[27] This class was defined
as "All persons who, as of June 1, 1991, [are] members of the I37 North
Residential Property Damage Class and whose real property within that class
overlies and/or has been contaminated by the subsurface plume of toxic
contaminates which geographical area is not greater than the area of the
striped triangle on the Property Damage Class Map in Plaintiff's Exhibit
31".